## COMMONWEALTH vs. LAM HUE TO.

Suffolk. October 3, 1983. — February 29, 1984.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Practice, Criminal,* Disclosure of evidence, Mistrial, Dismissal, Conduct of prosecutor. *Due Process of Law,* Disclosure of evidence, Conduct of prosecutor.

A prosecutor's misconduct in failing to disclose, prior to trial of a murder indictment, information concerning a knife found at the scene of the homicide, and certain statements concerning a second knife, would not warrant dismissal of the indictment with prejudice unless the prosecutor's conduct was intended to provoke the defendant into moving for a mistrial or dismissal, or unless the prosecutor's failure to make timely disclosure caused the defendant such irremediable harm as to preclude a fair trial of the indictment. [308-314]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on March 23, 1982.

The case was reported by *Lynch,* J.

*Robert S. Sinsheimer,* Assistant District Attorney (*John P. Corbett,* Assistant District Attorney, with him) for the Commonwealth.

*Juliane Balliro* for the defendant.

HENNESSEY, C.J. This case involves the propriety and effect of an order issued by a judge of the Superior Court pursuant to Mass. R. Crim. P. 14 (c)(1), 378 Mass. 874 (1979),[1] purporting to dismiss a murder indictment after the commencement of a jury trial. The Commonwealth sought appellate review of the order by filing a petition with a single

---

[1] Rule 14 (c)(1) provides as follows: "SANCTIONS FOR NONCOMPLIANCE. (1) *Relief for Nondisclosure.* For failure to comply with any discovery order issued pursuant to this rule, the judge may make a further order for discovery, grant a continuance, or enter such other order as he deems just under the circumstances."

justice of this court under G. L. c. 211, § 3. The single justice reserved and reported the case without decision to the full court on four questions. We answer "Yes" to the second question and have an insufficient record to answer questions 1, 3, and 4. Accordingly, we direct the single justice to remand the case to the Superior Court for further hearings consistent with this opinion.

During trial, the defendant filed alternative motions for a continuance, a mistrial or a dismissal of the indictment. The trial judge held an evidentiary hearing on the motions, made findings and rulings, and allowed the motion to dismiss the indictment. We summarize the facts as found by the trial judge. On August 27, 1981, Jorge Martinez-Lorenzi, a fourteen year old boy (the victim), was involved in a dispute pitting himself, Wilberto Rosario, and Jaime Anayas against Lam Hue To and Dinh Li. During the altercation, the victim sustained a stab wound from which he later died. The fracas took place on or near the front steps of a residence at 43 Haverhill Street in Brockton. The first floor of this house was occupied by Rosario's uncle and aunt, Pablo and Paula Cruz. The Brockton police arrived shortly after the stabbing and Officer Arthur Sullivan took charge of the investigation.

Unable to speak Spanish, Officer Sullivan relied completely upon Pablo and Paula Cruz, who volunteered their services, for interpretation in interviewing bystanders. Based entirely upon the information filtered to him through Pablo and Paula Cruz — neither of whom had witnessed the stabbing or its antecedents — Sullivan concluded that the victim had been stabbed with a knife and that the defendant or Dinh Li had stabbed him.

Officer Sullivan arranged for Pablo Cruz, Rosario, and Anayas to go with him to police headquarters in his cruiser. While they were seated in the vehicle, but before Sullivan took the wheel, another officer, John Flynn, gave Sullivan a knife which Flynn said he had found in the bushes immediately to the right of the front steps at 43 Haverhill Street. The knife is a wooden-handled, steel-bladed boning knife. When Sullivan received it from Flynn, its blade bore

brownish, reddish stains which Sullivan knew, or as a police officer should have known, resembled dried blood. At this juncture, Sullivan had been at the scene for approximately ten minutes. He knew that the stabbing weapon had not been located. Sullivan showed the knife to Cruz, who told him that his wife had been using it in the kitchen, had heard noises in the street (from the crowd that gathered immediately after the stabbing), had run out, neglecting to leave the knife behind, and had inadvertently dropped it.

Officer Sullivan placed the knife on the floor of his cruiser and proceeded with his passengers to police headquarters. Either en route or shortly after arriving, he learned that the police had arrested the defendant and Dinh Li. Sullivan assumed one of them had committed the stabbing, and thereafter ceased trying to determine who had committed the stabbing or even how it had been committed.

At headquarters, Officer Sullivan learned that Cruz was someone's uncle. He did not pursue the matter before going off duty. Sullivan tagged the knife and put it in his personal locker, where it remained until he removed it sometime during the week preceding the trial. He made no report concerning the knife's existence. It was never tested for latent fingerprints or blood.

The day after the incident, August 28, 1981, Sullivan returned to the Cruz house (the scene of the stabbing). By this time, the victim had died and the case had turned into a homicide. No one had found any weapon other than the knife which was now in Sullivan's locker. Cruz told Sullivan that an individual who wished not to become involved in the affair had found a knife (the second knife) with which the defendant was supposed to have killed the victim. Sullivan neither investigated this matter nor prepared any written report of any of his activities or information. Sullivan did not mention to any assistant district attorney the knife in his locker or Cruz's report of the second knife.

On September 28, 1981, Officer Sullivan testified before the Plymouth County grand jury. He was asked, "Did you find the knife?" He answered, "No," and did not qualify his

answer or expand it. The grand jury indicted the defendant for murder.[2]  No knife said to have been the murder weapon ever came to the attention of either the Brockton police department or the Plymouth County district attorney's office. On October 26, 1981, the district attorney agreed, in writing, to furnish the defendant with all exculpatory evidence available to the prosecution and to make available to him certain specified objects. The trial judge ruled that this agreement had the force of a court order.[3]

As part of the normal pretrial preparation, the prosecutor interviewed Sullivan on January 7, 1982. During the conversation, Sullivan told the prosecutor about the knife in his locker and about the second knife. In response to the prosecutor's direction, Sullivan prepared a written report concerning the matter. Sullivan delivered the report to the prosecutor on January 11, 1982, the day the jury were empanelled and trial commenced.

Meanwhile, at 9:30 A.M. on January 8, 1982, the judge held a pretrial conference. During the conference, which lasted over thirty minutes, the judge discussed such matters as jury selection, interrogation and possible sequestration, interpreters, evidentiary stipulations, lists of anticipated witnesses, and the possibility of a witness's requiring immunity. The judge also specifically invited counsel to raise for preliminary consideration any special evidentiary problems. At several points, the judge explicitly asked counsel if "any other problems" existed. At no time during this conference did the prosecutor state the knowledge he then had concerning either of the knives. The trial judge found that the pros-

---

[2] The trial judge found the defendant's indictment was based on more than Sullivan's testimony: "The Assistant District Attorney's opening statement to the jury made clear that the Commonwealth would introduce evidence other than the testimony of Sullivan to link the defendant with the actual stabbing. Thus, although Sullivan's Grand Jury testimony was at best disingenuous, and at worst, false, I cannot find that the indictment rested upon it."

[3] Neither of the parties contest the judge's ruling that the agreement had the force of a court order. We accept that ruling here. Cf. *Commonwealth* v. *Delaney*, 11 Mass. App. Ct. 403 n.3 (1981).

ecutor possessed no valid reason for failing to tell defense counsel and the judge everything he then knew about the knives, and that this failure was a serious and inexcusable professional misjudgment.

Late in the afternoon of January 8, 1982, the prosecutor for the first time mentioned the knife to defense counsel. The prosecutor said the knife had been found after August 27 and that it had been found "imbedded in dirt." Both statements were incorrect. The prosecutor also told defense counsel he was satisfied the knife had nothing to do with the case, did not tell defense counsel that the knife belonged to Rosario's uncle and aunt, and did not tell him that it was stained when found. Relying on the prosecutor's statements, defense counsel concluded that the knife was not significant. The prosecutor said nothing at all about the second knife.

The judge found that the "content of [the prosecutor's] statement to [defense counsel], and equally important, its omissions, seriously prejudiced [defense counsel's] preparation and presentation of his client's defense." According to the judge, had the prosecutor fully disclosed his then knowledge concerning the knife and the second knife, defense counsel would have had an opportunity to apply for a continuance before trial to pursue the obvious investigatory leads. Lulled by what the prosecutor had told him (or did not tell him), the judge concluded, defense counsel did not do so. Moreover the judge found that, possessed of the information to which he was entitled, "[defense counsel] would have planned a different, and probably more effective, trial strategy and would have made a different, and probably more effective opening to the jury."

On January 12, during cross-examination of Rosario, defense counsel learned for the first time that the knife belonged to Rosario's aunt and uncle and that it had stains on its blade. Upon learning these details regarding the knife, defense counsel moved for a dismissal of the indictment. The motion was based on the Commonwealth's failure to disclose all facts surrounding the knife and to present it for defense counsel's examination prior to trial. The defendant

claimed that the knife was "an extremely important piece of exculpatory evidence." According to the defendant, "it very well may be the weapon that caused the fatal injury" or "it's extremely important" "with respect to the defense of self-defense," when combined with the alleged presence of another knife at the scene. The judge discontinued testimony at this point and held an evidentiary hearing on the defendant's motion to dismiss, outside the presence of the jury. After the conclusion of evidence on the motion to dismiss, the defendant made alternative motions for a mistrial or continuance of the trial. The judge then held a hearing on these motions. The following day he allowed the defendant's motion to dismiss the indictment and discharged the jury. The Commonwealth filed a motion for a new hearing, which was denied. The Commonwealth then filed a petition with this court seeking relief from the judge's order of dismissal.[4]

A single justice of this court reserved and reported the case without decision on the following issues: "1. Whether the trial court properly dismissed the indictment in the circumstances of this case. 2. Whether a motion to dismiss for failure to provide exculpatory evidence raises the issue of prosecutorial misconduct. 3. Whether the findings and rulings of the trial judge were warranted on the evidence before him. 4. Whether the dismissal of the indictment by the trial judge precludes retrial of the defendant for the same offense."[5]

---

[4] General Laws c. 278, § 28E, provides the Commonwealth with a right of appeal to this court from an order allowing a dismissal of an indictment. The Commonwealth did not rely on that statute in this appeal, but instead sought relief under G. L. c. 211, § 3. Although the harm alleged here by the Commonwealth is of the "irremediable" nature which is appropriate for review under c. 211, § 3, nevertheless that extraordinary remedy should be invoked only when appellate review is otherwise unavailable. See, generally, *Commonwealth* v. *Cook*, 380 Mass. 314, 320-321 (1980). We treat this case as before us under G. L. c. 278, § 28E. Cf. *Commonwealth* v. *Therrien*, 383 Mass. 529, 532-536 (1981).

[5] The dismissal without more does not establish that the judge intended to preclude reindictment and retrial of the defendant, and the judge made no specific statement as to those issues. We think the single justice of this court correctly inferred from the entire record that the trial judge intended that the dismissal should preclude further proceedings.

The trial judge relied on Mass. R. Crim. P. 14 (c)(1), 378 Mass. 874 (1979), in dismissing the defendant's indictment. The Commonwealth argues that the discretion afforded trial judges under rule 14 (c)(1), to fashion remedies for violations of discovery orders, does not include the mid-trial dismissal of an indictment as occurred here. The defendant asserts the dismissal was proper.

We answer question two in the affirmative, because it is clear in the circumstances of this case that the motion to dismiss raised the issue of prosecutorial misconduct. On the record before us, we are unable to answer the other three questions reported by the single justice, because all three implicate the issue of retrial of the defendant. While it is clear, as seen *infra*, that a dismissal of an indictment precluding retrial of the defendant for the same offense may, in appropriate circumstances, be proper under rule 14 (c)(1), the present record does not establish such irremediable harm that a fair trial is not now possible. Accordingly, this case must be remanded for further proceedings consistent with the reasoning set forth *infra*.

Determining whether the trial judge abused his discretion under Mass. R. Crim. P. 14 (c)(1) requires a review of his findings of fact and conclusions of law. On review of the whole record, we accept the trial judge's subsidiary findings of fact under "the well established principle of appellate review that subsidiary findings of fact made by the judge below will be accepted by the court absent clear error." *Commonwealth* v. *Aarhus*, 387 Mass. 735, 742 (1982). See *Commonwealth* v. *Harvey*, 390 Mass. 203, 205 (1983), quoting *Commonwealth* v. *Angivoni*, 383 Mass. 30, 33 (1981), quoting *Commonwealth* v. *Meehan*, 377 Mass. 552, 557 (1979), cert. dismissed as improvidently granted, 445 U.S. 39 (1980). We find no such error.

Turning to the trial judge's rulings of law, we find them to be these: (1) the prosecution withheld exculpatory evidence in violation of the rule established in *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963); (2) there was prosecutorial misconduct warranting dismissal of the defendant's indict-

ment; (3) the defendant's motion to dismiss is allowed. We address each of these rulings separately below.

We agree with the judge that the discovery agreement of the parties, deemed to have the force of a court order, was violated by the prosecutor. A court order to disclose exculpatory evidence necessarily implies that a prosecutor must comply with constitutional standards of disclosure to ensure a fair trial. See *United States* v. *Agurs*, 427 U.S. 97, 107-108 (1976); *Brady* v. *Maryland*, 373 U.S. 83 (1963). Accordingly, a finding that the prosecutor violated constitutional standards in failing to disclose exculpatory evidence is sufficient to support a ruling that a court order to disclose exculpatory evidence has been violated as well.

Where, as in this case, there is an agreement with the force of a court order to disclose all exculpatory evidence, three factors are considered in determining whether the prosecutor violated his constitutional duty in failing to disclose exculpatory evidence prior to trial and whether remedial action is required. We consider the exculpatory and material nature of the evidence, and whether the delay in disclosing it prejudiced the defendant. See *Commonwealth* v. *Wilson*, 381 Mass. 90, 107 (1980). See also *Commonwealth* v. *Bryant*, 390 Mass. 729, 745-749 (1984); *Commonwealth* v. *Liebman*, 388 Mass. 483, 487-488 (1982); *Commonwealth* v. *Baldwin*, 385 Mass. 165, 173-175 (1982). Here, the prosecution admitted in argument before the trial judge that the undisclosed evidence was both exculpatory and material. The prosecutor stated, "I certainly would not argue that the knife was not exculpatory and material . . . ." While the Commonwealth argues before this court that the undisclosed evidence was not exculpatory or material, its admission below waives its right to raise these issues now. See *Albert* v. *Municipal Court of the City of Boston*, 388 Mass. 491, 493 (1983); *Altschuler* v. *Boston Rent Bd.*, 386 Mass. 1009, 1010 (1982), quoting *Jones* v. *Wayland*, 374 Mass. 249, 252-253 n.3 (1978) ("The theory of law on which by assent a case is tried cannot be disregarded when the case comes before an appellate court for review of the acts of the trial judge").

Moreover it is clear to us that the evidence was exculpatory and material. We therefore need consider only whether the late disclosure of the evidence was prejudicial to the defendant.

Whether and the extent to which the defendant was disadvantaged in defending himself are the pivotal issues when considering the prejudicial quality of exculpatory, material evidence disclosed only after commencement of trial. "Where evidence meeting the constitutional standards for materiality is initially suppressed, but then disclosed, it is the consequences of the delay that matter, not the likely impact of the nondisclosed evidence, and we ask whether the prosecution's disclosure was sufficiently timely to allow the defendant 'to make effective use of the evidence in preparing and presenting his case.'" *Commonwealth* v. *Wilson*, 381 Mass. 90, 114 (1980), quoting *Commonwealth* v. *Adrey*, 376 Mass. 747, 755 (1978).

The judge found that the defendant's preparation and presentation of his defense were adversely affected by the Commonwealth's late disclosure of information regarding the two knives in question. The judge wrote as follows: "If a defendant becomes aware at trial of the undisclosed facts early enough to afford him full opportunity to examine on them, the prosecution's misdeeds, however inexcusable, do not warrant remedial action, *Commonwealth* v. *Ellison*, 376 Mass. 1, 25 (1978). . . . Here, the information — that is, the full information — did not come to Defendant's counsel until after his investigation had ended, his trial strategy set, and his opening completed. He could perhaps use some of it, but not to the degree which he would have, had the prosecution acted properly. Thus, proceeding with the trial is not an appropriate disposition." The Commonwealth challenges these findings and rulings by the judge. It argues that the judge adopted the correct legal standard, but misapplied it to the facts before him. We find no merit in the Commonwealth's position. The facts presented allow for a finding of prejudice and "[a] trial judge's discretion to find prejudice is much broader than ours," *Commonwealth* v.

*Baldwin,* 385 Mass. 165, 177 (1982). We think the judge was correct in ruling that the late disclosure of exculpatory material by the prosecution in this case, in violation of the discovery order, was sufficiently prejudicial to warrant remedial action under Mass. R. Crim. P. 14 (c)(1).

Next we must consider the propriety of the relief ordered by the trial judge. The grant of a mistrial followed by a new trial is the relief typically granted where a defendant is prejudiced by a prosecutor's failure to disclose properly exculpatory, material evidence. See *Brady* v. *Maryland,* 373 U.S. 83, 87 (1963); *Commonwealth* v. *Ellison, supra* at 3. Accord *Commonwealth* v. *Salman,* 387 Mass. 160, 165 n.3, & 168 (1982). Here, however, the trial judge purported to do more than grant a mistrial. He stated, "The circumstances in this case disclose a plain tale of prosecutorial misconduct lacking the slightest justification. . . . Ordinarily, the remedy of choice would be a mistrial, with the government free to move anew for trial . . . . In an appropriate case, however, dismissal is the proper sanction . . . . [T]his case presents compelling justification for imposing the maximum sanction. . . . Defendant's motion to dismiss is allowed." We must consider, therefore, whether the trial judge acted within the bounds of his discretion under rule 14 (c)(1), in purporting to dismiss the indictment rather than granting a mistrial with the possibility of a new trial.

The relief which a trial judge may order under Mass. R. Crim. P. 14 (c)(1), includes, without doubt, that relief which constitutional principles require. Here, the judge suggested at least one such basis for dismissal of the defendant's indictment. We turn to an examination of this principle.

The defendant in this case moved for a dismissal of the indictment or a mistrial.[6] Usually a mistrial granted upon the defendant's request does not present a bar to retrial on double jeopardy grounds. *Commonwealth* v. *Babb,* 389 Mass. 275, 282 (1983). See *Oregon* v. *Kennedy,* 456 U.S. 667, 672

---

[6] The defendant also moved for a continuance should both of these motions be denied.

(1982); *United States* v. *Scott*, 437 U.S. 82, 93 (1978) ("Where . . . a *defendant* successfully seeks to avoid his trial prior to its conclusion by a motion for mistrial, the Double Jeopardy Clause is not offended by a second prosecution" [emphasis in original]).  Cf. *United States* v. *Dinitz*, 424 U.S. 600, 606-608 (1976).  Similarly, the double jeopardy clause does not necessarily prevent retrial of a defendant whose motion to dismiss his indictment, made after jeopardy has attached, is allowed.  *United States* v. *Scott*, 437 U.S. 82, 96-97 (1978).  *Commonwealth* v. *Babb, supra* at 281.  Such dismissals may under some circumstances be treated like mistrials, or at least not as findings of acquittal.  See *Lee* v. *United States*, 432 U.S. 23, 31 (1977); *United States* v. *Martin Linen Supply Co.*, 430 U.S. 564, 570 (1977).  Cf. *Commonwealth* v. *Babb, supra* at 281.  There are, however, situations where the grant of a mistrial or the dismissal of an indictment on the defendant's motion will prevent retrial of a defendant.  Where a defendant's motion to dismiss or for a mistrial based upon "prosecutorial misconduct" is allowed, the double jeopardy clause may be a bar to further prosecution.

Here the trial judge cited "prosecutorial misconduct" as part of the basis for his decision to dismiss the defendant's indictment.  By prosecutorial misconduct he meant lack of disclosure by the prosecutor and the inept and "bungling" performance of the police, which is attributed to the prosecution.  *Commonwealth* v. *Redding*, 382 Mass. 154, 157 (1980).  This sort of prosecutorial misconduct is not sufficient to invoke the double jeopardy bar to further prosecution.  The prosecutorial misconduct which if established warrants a dismissal barring retrial differs from the general prosecutorial ineptitude in disclosing exculpatory evidence found by the trial judge.  To implicate double jeopardy protections, prosecutorial misconduct must be of a specific character:  "Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion."  *Oregon* v. *Kennedy*, 456 U.S. 667, 676

(1982). In the instant case, the issue of prosecutorial misconduct was raised by the defendant's allegation of impropriety in the late disclosure of exculpatory evidence. There is, however, no evidence in the record suggesting, nor did the judge find, that the prosecution in this case sought to goad the defendant into seeking an end to the trial. Accordingly, to the extent that the trial judge sought to rest his order of dismissal upon prosecutorial misconduct, it was not such misconduct as would necessarily raise the double jeopardy bar to retrial. Rather, the propriety of the trial judge's grant of a dismissal purporting to bar further prosecution, instead of granting a mistrial, must rest on grounds other than prosecutorial misconduct as discussed in *Oregon* v. *Kennedy, supra.*

The judge's rulings of law do suggest another basis for his decision: irremediable harm. In dismissing the indictment, he made reference to the fairness of allowing the defendant to be retried after full disclosure: The "Defendant has already been put to the effort and expense of preparing for trial and conducting his defense. It would be unfair, under these circumstances, to require Defendant to bear the physical, financial, and litigational brunt of the government's pattern of wrongdoing." This language may constitute a ruling that the prosecutor's late disclosure of the exculpatory evidence has so prejudiced the defendant that he will be unable to obtain a fair trial in any subsequent proceeding. He may have been denied the opportunity to investigate effectively circumstances surrounding the crime. Losing this opportunity, he may have been irreparably harmed. If this is the case, dismissal of the indictment was appropriate.

We have observed in contexts other than the nondisclosure of exculpatory evidence that a defendant's inability to obtain a fair trial occasioned by circumstances beyond his control will warrant the dismissal of an indictment against him. See *Gilday* v. *Commonwealth,* 360 Mass. 170, 171 (1971). Whether an indictment should be dismissed upon the defendant's motion where the prosecution has acted improperly, turns primarily on the ability of the defendant to obtain a

fair trial after, and in light of, the impropriety. Accordingly, in *Commonwealth* v. *Manning*, 373 Mass. 438, 444 (1977), we concluded that a new trial was an insufficient remedy where "[t]he indictment itself is so inextricably interwoven with the misconduct which preceded it [, and] that the only appropriate remedy [was] to dismiss the indictment." We found dismissal of the defendant's indictment necessary because "the officers' misconduct was so pervasive as to preclude any confident assumption that proceedings at a new trial would be free of the taint." *Id.* Other courts also have reached such results. See, e.g., *United States* v. *Levy*, 577 F.2d 200, 210 (3d Cir. 1978); *State* v. *Cory*, 62 Wash. 2d 371, 376-377 (1963). Similarly, improper delay by the prosecution in bringing a case to trial may so prejudice a defendant as to warrant the dismissal of an indictment with no possibility of retrial. *Barker* v. *Wingo*, 407 U.S. 514, 532-533 (1972) (prejudice to defendant's ability to prepare defense is "most serious" interest right to speedy trial was designed to protect). *Dickey* v. *Florida*, 398 U.S. 30, 38 (1970) ("death of two potential witnesses, unavailability of another, and the loss of police records" occurring during seven-year delay by prosecution constitute prejudice requiring dismissal). *Commonwealth* v. *Ludwig*, 370 Mass. 31, 33-34 (1976). *Commonwealth* v. *Gove*, 366 Mass. 351, 357 (1974) ("Prosecutorial failure to adhere to speedy trial standards necessitates immediate dismissal of charges against the accused").

While we have not had occasion specifically so to hold, we have suggested in the past that the dismissal of an indictment may be a proper remedy for the Commonwealth's failure to comply with a discovery order. See *Commonwealth* v. *Douzanis*, 384 Mass. 434, 436 (1981) ("There is no question that a judge may in his discretion order discovery of information necessary to the defense of a criminal case [Mass. R. Crim. P. 14 (a)(2), 378 Mass. 874 (1979)], and that, on failure of the Commonwealth to comply with a lawful discovery order, the judge may impose appropriate sanctions, which may include dismissal of the criminal charge [Mass. R.

Crim. P. 14 (c)(1)]"). See also *Commonwealth* v. *Baldwin,* 385 Mass. 165, 176 (1982). Cf. *Commonwealth* v. *Liebman,* 379 Mass. 671, 675 (1980); *Commonwealth* v. *St. Pierre,* 377 Mass. 650, 660 (1979). Cf. *Commonwealth* v. *Mandile,* 15 Mass. App. Ct. 83, 85 (1983); *Commonwealth* v. *Silva,* 10 Mass. App. Ct. 784, 790 (1980) ("We . . . think that the prosecution's defaults on discovery warranted an order of dismissal which would bar a subsequent indictment").

Such a drastic remedy would be appropriate where failure to comply with discovery procedures results in irremediable harm to a defendant that prevents the possibility of a fair trial. Whether the trial judge intended to find the prosecutor's late disclosure caused such irreparable prejudice to the defendant that a new trial could not be a fair trial, however, is unclear from his findings and rulings. Moreover, the record is not sufficiently well developed for us to review the propriety of such a finding if it were intended. We therefore must remand this case to the trial court for further proceedings on the extent of harm to the defendant caused by the prosecution's late disclosure of exculpatory evidence.

We answer "Yes" to question 2 because it is clear that the motion to dismiss raised the issue of prosecutorial misconduct. It is also clear that, in the circumstances, the judge was warranted in calling a halt to the trial upon the defendant's motion. We are unable on this record to answer the remaining three questions because they implicate the issue of retrial of the defendant. The single justice is to remand the case to the Superior Court for such further hearings, findings and rulings as the judge deems necessary for determination of the issue whether the defendant, by reason of the prosecution's violation of the discovery order, suffered such irremediable harm that a fair trial of the indictment is not possible.

*So ordered.*