NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13430

COMMONWEALTH  vs.  DENZEL MCFARLANE.


Hampden.     September 11, 2023. - January 23, 2024.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.[1]


Evidence, Disclosure of evidence, Exculpatory.  Practice,
     Criminal, New trial, Disclosure of evidence, District
     attorney.  District Attorney.  Police Officer.



     Complaint received and sworn to in the Springfield Division
of the District Court Department on July 10, 2017.

     The case was tried before Robert S. Murphy, Jr., J., and a
motion for a new trial, filed on August 19, 2020, was heard by
him.

     After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.


     Laurence J. Cohen for the defendant.
     Rebecca A. Jacobstein, Committee for Public Counsel
Services, for Committee for Public Counsel Services & another.
     David L. Sheppard-Brick, Assistant District Attorney, for
the Commonwealth.
     Patrick Hanley (Elizabeth K. Keeley also present) for State
Police Association of Massachusetts.

_____

     [1] Justice Cypher participated in the deliberation on this
case and authored her concurrence prior to her retirement.

Shoshana E. Stern, Assistant District Attorney, for District Attorney for the Berkshire District & others, amici curiae, submitted a brief.

John P. Zanini & Cailin M. Campbell, Assistant District Attorneys, for District Attorney for the Plymouth District & others, amici curiae, submitted a brief.

GAZIANO, J.  On February 11, 2020, the defendant, Denzel Mcfarlane, was convicted of unlawful possession of a firearm and other related charges by a jury in the Springfield Division of the District Court Department.[2]  Ten days later, Officer Daniel Moynahan of the Springfield police department, who had arrested and testified against the defendant, was found civilly liable for false arrest and false imprisonment in an unrelated lawsuit.  See Bradley vs. Cicero, U.S. Dist. Ct., No. 3:18-cv-30039-MGM (D. Mass. Feb. 21, 2020).

Upon learning of this civil lawsuit and verdict against Moynahan from an online news publication, the defendant filed a motion for a new trial, asserting that the existence of the lawsuit against Moynahan, still pending at the time of trial, was exculpatory information that the Commonwealth should have disclosed to the defense, but failed to do so.  The District Court judge who had presided over the defendant's trial denied his motion.  The Appeals Court agreed that a new trial was

---

[2] The defendant was also convicted of unlawful possession of ammunition and improper storage of a firearm.

unwarranted and affirmed the denial.  Both parties then filed applications for further appellate review, which we granted.

The question presented in this case is whether the existence of a pending civil lawsuit against a police officer must be disclosed by a prosecutor as exculpatory evidence.  We answer that question in the negative.  Until a finding of liability has been made, a pending civil lawsuit constitutes an unsubstantiated allegation of police misconduct that does not tend to negate the guilt of a defendant.  We therefore affirm the denial of the defendant's motion for a new trial.

Finally, as in Graham v. District Attorney for the Hampden Dist., 493 Mass.    (2023), also released today, we address the parameters of the prosecutorial duty of inquiry.  Although a prosecutor has no duty to inquire into pending civil lawsuits against a prosecution team member, we conclude that the duty of inquiry does require that prosecutors inquire about the existence of any findings of civil liability related to the performance of a police officer's duties.[3]

1.  Background.  a.  Facts.  On review of a judge's denial of a defendant's motion for a new trial, "[w]e recite the

---

[3] We acknowledge the amicus briefs submitted by the Committee for Public Counsel Services and American Civil Liberties Union of Massachusetts; the State Police Association of Massachusetts; and the district attorneys for the Plymouth, Berkshire, Bristol, Cape and Islands, eastern, Norfolk, northwestern, and middle districts.

relevant facts as found by the motion judge, supplemented by the record." Commonwealth v. Yat Fung Ng, 489 Mass. 242, 243 (2022), S.C., 491 Mass. 247 (2023).

i. Officers' version. On the afternoon of July 7, 2017, Moynahan and Officer Brian Phillips were on patrol when they noticed a black Infiniti G37. After entering the Infiniti's license plate number into the cruiser's mobile data terminal, the officers learned that the license plate was registered to a different vehicle and that the registration had previously been revoked for lack of insurance. Both officers observed the defendant park the vehicle, exit, and approach the front bumper, leaving the driver's side door open. The officers could also see a female passenger sitting in the front seat and at least one child sitting in the back seat.[4]

After activating the cruiser's emergency lights and pulling up to the Infiniti, Phillips got out of his cruiser and approached the defendant, while Moynahan approached the passenger's side of the Infiniti. Phillips asked the defendant for his driver's license, which he did not have. Phillips then brought the defendant toward the rear of the vehicle to question him further. While walking past the open driver's side door,

---

[4] It is unclear how many children were in the Infiniti. At trial, the officers testified that they observed one toddler in the back seat, while the defendant and the female passenger testified that there were two children in the back of the car.

Phillips observed a firearm lodged between the driver's seat and the center console. When asked by Phillips if he had a license to carry the firearm, the defendant stated that he did not. Phillips then arrested the defendant, placing him in the cruiser in handcuffs.

After Phillips informed Moynahan of the presence of the firearm, Moynahan ordered the female passenger out of the vehicle and placed her in handcuffs. Moynahan testified that, upon witnessing this, the defendant yelled from the back of the police cruiser, "She has nothing to do with it. It's not hers."[5] Moynahan then uncuffed the female passenger. After the police photographed the firearm inside the Infiniti, Moynahan removed the firearm and secured it, emptying nine bullets from the magazine. The officers permitted the other occupants of the car to leave and transported the defendant to the police station. During the booking procedure, the defendant stated that the firearm had been loaded with four bullets.

ii. <u>Defendant's version</u>. The defendant testified to a different version of events at trial in several respects. Most notably, the defendant testified that he had no knowledge of the firearm, having just purchased the Infiniti from a third party shortly before his arrest. The defendant also claimed that he

_____

[5] Phillips similarly testified that the defendant shouted, "It's mine, not hers. Let her go."

had stepped out of his new vehicle to fix its splash guard when Phillips suddenly approached him, grabbed and handcuffed him, and placed him in the back of the cruiser.  Phillips then returned to the cruiser, holding a firearm, and asked the defendant why he did not tell Phillips about it.  The defendant denied witnessing the female passenger being placed in handcuffs, and he likewise denied that he yelled any statement about the firearm from the back of the cruiser.  Lastly, although the defendant acknowledged that he had stated, while being booked, that the firearm was loaded with four bullets, he explained that he had been informed by Moynahan of this fact when Moynahan, having disassembled the firearm in the police cruiser, mentioned the presence of four bullets.

iii.  Civil lawsuit.  In March 2018, a civil lawsuit was brought against Moynahan by Daniel Bradley, who had been arrested during a motor vehicle stop in Springfield by Moynahan and two other officers.  In his action, Bradley asserted various constitutional, statutory, and common-law claims against Moynahan, including unlawful seizure and arrest, false imprisonment, false arrest, excessive force, assault and battery, malicious prosecution, abuse of process, and intentional infliction of emotional distress.  On February 21, 2020, Moynahan was found liable for false arrest and false

imprisonment.  Shortly thereafter, the defendant learned about this lawsuit from an online publication.

b.  Procedural history.  The defendant was arraigned at the Springfield Division of the District Court Department on July 10, 2017.  He was charged with eight counts, including unlawful possession of ammunition, G. L. c. 269, § 10 (h); unlawful possession of a firearm, G. L. c. 269, § 10 (a); and improper storage of a firearm, G. L. c. 140, § 131L.[6]  The defendant's trial began in February 2020.  On February 11, the jury found the defendant guilty of unlawful possession of a firearm, unlawful possession of ammunition, and improper storage of a firearm.

In August 2020, the defendant filed a motion for a new trial, asserting that the allegations against Moynahan in the civil lawsuit -- and indeed the lawsuit's very existence -- constituted exculpatory evidence requiring disclosure by the Commonwealth.  On July 2, 2021, after a nonevidentiary hearing, the District Court judge who had presided at the defendant's

---

[6] On February 7, 2020, the prosecutor entered nolle prosequis with respect to the other five counts:  operation of an uninsured motor vehicle, G. L. c. 90, § 34J; operation of an unregistered motor vehicle, G. L. c. 90, § 9; operation of a motor vehicle without a valid inspection sticker, G. L. c. 90, § 20; operation of a motor vehicle with a revoked license as a habitual traffic offender, G. L. c. 90, § 23; and attaching a number plate assigned to another vehicle to conceal identification, G. L. c. 90, § 23.

trial issued a written decision denying the defendant's motion for a new trial.

The defendant timely appealed from his convictions and from the denial of his motion for a new trial. The Appeals Court affirmed the defendant's convictions and the order denying the defendant's motion for a new trial. See Commonwealth v. Mcfarlane, 102 Mass. App. Ct. 264, 277 (2023). In May 2023, we granted the parties' applications for further appellate review limited to the issues raised in connection with the denial of the defendant's motion for a new trial.[7]

2. Discussion. a. Motion for a new trial. In denying the defendant's motion for a new trial, the motion judge concluded that the then-pending civil lawsuit against Moynahan "was not Brady material" that the prosecutor was obligated to disclose, reasoning that the prosecutor was not aware of the

---

[7] An order from a single justice of this court also permitted the parties in this case to brief whether the defendant is entitled to a new trial based on failure to instruct the jury on the issue of licensure under Commonwealth v. Guardado, 491 Mass. 666, 690-693, S.C., 493 Mass. 1 (2023). We review for whether the error was harmless beyond a reasonable doubt. See Commonwealth v. Bookman, 492 Mass. 396, 401 (2023). Here, Phillips offered uncontested testimony that the defendant admitted he did not possess a license to carry a firearm. See id. (when officer testifies to lack of license and there is "nothing in the record to suggest that the defendant disputed this testimony, or that the officer's credibility was in question," failure to instruct is harmless beyond reasonable doubt). Accordingly, we conclude that the defendant is not entitled to a new trial on this basis.

lawsuit's existence, the lawsuit was neither requested by the defendant nor related to his case, and the lawsuit could have been discovered by defense counsel through independent investigation given that it was not impounded. See Brady v. Maryland, 373 U.S. 83, 87 (1963). The judge further reasoned that the lawsuit would not have been admissible at the defendant's trial to impeach Moynahan but that, even assuming that it would have been admissible and that the prosecutor had been obligated to disclose it, the defendant would not have suffered any prejudice because it "would have functioned only as impeachment evidence in a case where the testimony of Moynahan was duplicated by, and less essential than, the untainted testimony of Phillips."

On appeal, the defendant argues that the motion judge erred in denying his motion for a new trial, as the Commonwealth's failure to disclose the pending civil lawsuit against Moynahan violated the prosecutor's duty of disclosure. "The decision to deny a motion for a new trial lies within the sound discretion of the judge and will not be reversed unless it is manifestly unjust or the trial was infected with prejudicial constitutional error." Commonwealth v. Jenkins, 458 Mass. 791, 803 (2011).

"To obtain a new trial on the basis of nondisclosed exculpatory evidence, a defendant must establish (1) that 'the evidence [was] in the possession, custody, or control of the

prosecutor or a person subject to the prosecutor's control'; (2) 'that the evidence is exculpatory'; and (3) 'prejudice'" (citation omitted).  Commonwealth v. Sullivan, 478 Mass. 369, 380 (2017).  Setting aside the motion judge's determination on the first and third factors, we examine the second:  whether the existence of a pending civil lawsuit against a member of the prosecution team, Moynahan, tended to exculpate the defendant.  See id.  See also Matter of a Grand Jury Investigation, 485 Mass. 641, 649 (2020).

"To prevail on a claim that the prosecution failed to disclose exculpatory evidence, the defendant must first prove that the evidence was, in fact, exculpatory."  Commonwealth v. Healy, 438 Mass. 672, 679 (2003).  Exculpatory evidence is "not a narrow term" here, but rather includes all evidence that tends to negate the guilt of the accused.  Id., quoting Commonwealth v. Pisa, 372 Mass. 590, 595, cert. denied, 434 U.S. 869 (1977).  This includes evidence that "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of events, or challenges the credibility of a key prosecution witness."  Matter of a Grand Jury Investigation, 485 Mass. at 647, quoting Commonwealth v. Ellison, 376 Mass. 1, 22 (1978).

While our conception of exculpatory evidence is rightfully broad, it is not boundless.  The civil lawsuit at issue here exceeds those bounds.  By virtue of being both (1) civil, rather than criminal, and (2) pending, rather than fully adjudicated, pending civil lawsuits are not exculpatory and are not subject to automatic disclosure requirements.  See Graham, 493 Mass. at    .

We reach this conclusion for several reasons.  Most notably, the civil pleading stage only requires "factual 'allegations plausibly suggesting'" an entitlement to relief. Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007). Therefore, until there is a finding of liability, a pending civil lawsuit may well be without merit.  Moreover, the standard for the initiation of a civil lawsuit is lower than the corresponding standard and procedures for the initiation of a criminal prosecution.  See W.L. Prosser & W.P. Keeton, Torts § 120, at 893 (5th ed. 1984) (less needed to justify bringing civil suit versus criminal prosecution).  See also Commonwealth v. DiBennadetto, 436 Mass. 310, 313 (2002) (defendant may move to dismiss criminal complaint issued by magistrate for lack of probable cause); Lataille v. District Court of E. Hampden, 366 Mass. 525, 532 (1974) (grand jury serve "dual function of determining whether there is probable cause to believe a crime

has been committed and of protecting citizens against unfounded criminal prosecutions").  As a result of these distinctions, pending civil lawsuits would most accurately constitute unsubstantiated allegations of misconduct and not exculpatory information.  See United States Department of Justice, Justice Manual, tit. 9-5.100(6) (updated Jan. 2020) [https://perma.cc/NKL2-YZ2J] (Justice Manual) ("Allegations that cannot be substantiated . . . generally are not considered to be potential impeachment information").

Here, even assuming Moynahan was a key prosecution witness, the defendant would not have been able to meaningfully challenge his testimony with what, at the time, amounted to unsubstantiated allegations of police misconduct.  Therefore, the then-pending civil lawsuit did not tend to negate the defendant's guilt, and the defendant's motion for a new trial, predicated on the Commonwealth's failure to disclose exculpatory evidence, was rightfully denied.  See Sullivan, 478 Mass. at 380, citing Commonwealth v. Murray, 461 Mass. 10, 19, 21 (2011) (information must be proved exculpatory).

b.  The duty of inquiry and findings of civil liability. In affirming the denial of the defendant's motion for a new trial in this case, we caution that our ruling today is not intended to signal to prosecutors that they may abstain from inquiring into findings of civil liability.  We take this

opportunity to provide guidance, in conjunction with our decision in Graham, on the scope of a prosecutor's duty of inquiry. See Commonwealth v. Martin, 427 Mass. 816, 823-824 (1998) ("duty to inquire" about exculpatory information is essential to performance of prosecutor's discovery obligations). More specifically, we conclude that findings of civil liability, unlike pending civil lawsuits, fall within the scope of the duty of inquiry.

The duty of inquiry reinforces the duty of disclosure: because the prosecution must disclose all evidence in the possession, custody, or control of the prosecution team that "tend[s] to" exculpate defendants, the prosecution also must inquire about the existence of such evidence among members of the prosecution team. Matter of a Grand Jury Investigation, 485 Mass. at 649. See Mass. R. Crim. P. 14 (a) (1) (A), as amended, 444 Mass. 1501 (2005). See also Commonwealth v. Ware, 471 Mass. 85, 95 (2015), quoting Commonwealth v. Beal, 429 Mass. 530, 532 (1999) ("It is well established that the Commonwealth has a duty to learn of and disclose to a defendant any exculpatory evidence that is 'held by agents of the prosecution team'"). Just as "the ultimate admissibility of the information is not determinative" of a prosecutor's disclosure obligations, admissibility is likewise not determinative of a prosecutor's

obligation to inquire.  Matter of a Grand Jury Investigation, supra at 653.[8]  The two duties are inextricably connected.

"'Reasonableness' is the only limitation on the prosecutor's duty of inquiry."  Commonwealth v. Frith, 458 Mass. 434, 440-441 (2010).  Reasonableness is an objective standard -- "a prosecutor's belief that no inquiry is necessary or required in the circumstances of a particular case, based only on the prosecutor's assumption that he [or she] already has all of the items and information subject to discovery, does not comport" with the duty of inquiry.  Id. at 440.  Rather, to satisfy the duty of reasonable inquiry, prosecutors are duty-bound to ask other members of the prosecution team whether "all discoverable materials relating to a particular case have been given to the Commonwealth" and, subsequently, the defendant.  Id. at 441 (by failing to do so, prosecutor "plainly knew" he did not make reasonable inquiry).  See Martin, 427 Mass. at 824 (duty of reasonable inquiry "extend[s] to information in possession of a person who has participated in the investigation or evaluation

---

[8] We stated, in Matter of a Grand Jury Investigation, 485 Mass. at 653, that "[exculpatory] information should be disclosed [even] to  unrelated defendants so that the trial judge may rule on its admissibility if the defendant were to seek its admission."  In other words, a trial judge cannot rule on the admissibility of impeachment evidence if unaware of its existence.  See id.  Prosecutors who engage in the analysis suggested by Justice Lowy's concurrence when fulfilling their duties of inquiry and disclosure proceed at their peril.

of the case and has reported to the prosecutor's office concerning the case").  See also Commonwealth v. Campbell, 378 Mass. 680, 702 (1979) ("prosecutor has no duty to investigate every possible source of exculpatory information on behalf of the defendants," only those in possession of prosecution team).  The burden of the duty of inquiry rests solely with the prosecution.

In short, the scope of the duty of inquiry is driven by what "tend[s] to exculpate" the defendant, Matter of a Grand Jury Investigation, 485 Mass. at 649, and demands that prosecutors ask all members of their prosecution team for "all discoverable materials" related to the defendant's case, Frith, 458 Mass. at 441.  Because the purpose of our discovery rules is to promote judicial efficiency and prevent trial by ambush, "it is appropriate to take a comprehensive view" of a prosecutor's investigative obligations.  Commonwealth v. Correia, 492 Mass. 220, 224 (2023).

A bright-line rule is necessary to guide disclosure and inquiry requirements related to civil lawsuits.  Therefore, we conclude that findings of civil liability made against prosecution team members in the performance of their official duties are subject to automatic disclosure and fall within the duty of inquiry.  Matter of a Grand Jury Investigation, 485 Mass. at 649.

A finding of civil liability is different from a pending civil lawsuit, which, as noted supra, has a lower threshold than criminal prosecutions and can be brought by various private parties with varying motives.  In contrast, an adjudicated finding of civil liability is the result of judicial process, where evidence has been weighed, arguments heard, and a decision rendered.  See Graham, 493 Mass. at    (prosecutor cannot, "consistent with their obligation to disclose exculpatory information," decide not to disclose judicial finding that officer's statements were not credible).  See also Justice Manual, supra at tit. 9-5.100(5)(c)(iv) (including "prior findings by a judge" within potential impeachment information). Cf. id. at tit. 9-5.100(6) (excluding "unsubstantiated" allegations of misconduct from potential impeachment information).  Therefore, findings of civil liability can have exculpatory value, while pending civil lawsuits cannot.

That is not to say that any finding of civil liability may be exculpatory simply because it was made against an individual who also happens to be a member of the prosecution team; instead, the finding of civil liability must be related to the performance of that member's official duties.  See Matter of a Grand Jury Investigation, 485 Mass. at 652 (in deciding whether to allow impeachment of police officer witness with prior misconduct, judge may consider "whether the prior misconduct is

probative of how the officer conducts police investigations"). Given that civil lawsuits can be brought by various private litigants for a wide range of reasons, this consideration will assist in distinguishing civil suits related solely to a police officer's personal life from those relevant to his or her police work. See id., citing Lopes, 478 Mass. at 606.

Here, had the finding of civil liability been made before or during the defendant's trial, it would have fallen within the scope of the prosecutor's duty of disclosure and, therefore, his or her duty of inquiry. See Mass. R. Crim. P. 14 (a) (4), as appearing in 442 Mass. 1518 (2004); Frith, 458 Mass. at 436 n.4 (Commonwealth's duty of disclosure "continues throughout trial"). The misconduct alleged in the lawsuit was related directly to Moynahan's performance as a police officer. See Matter of a Grand Jury Investigation, 485 Mass. at 653. Moynahan was sued and found liable for false imprisonment and false arrest, among other allegations, and the defendant claimed, in defense, that the gun had been tampered with or, in other words, that he was falsely arrested by Moynahan. See Ellison, 376 Mass. at 20. With these conflicting narratives regarding how the arrest transpired, the defendant's conviction relied on Moynahan's testimony and, therefore, on Moynahan's credibility. See Murray, 461 Mass. at 22. Because the finding of civil liability could have been used to impeach Moynahan and

was known to a member of the prosecution team, it potentially would have been discoverable under Matter of a Grand Jury Investigation, supra at 649, and subject to the duty of inquiry under Frith, supra at 441.

Nonetheless, as explained supra, because the civil lawsuit was only pending at the time of trial, it did not mandate disclosure.  We recognize that, had the defendant's trial occurred a short while later, or if the findings against Moynahan had occurred a short while earlier, the prosecutor would have been obligated to inquire into and disclose the findings made against Moynahan.  However, "[w]henever the law draws a line there will be cases very near each other on opposite sides."  United States v. Wurzbach, 280 U.S. 396, 399 (1930).

3.  Conclusion.  As the civil lawsuit against Moynahan was pending at the time of the defendant's trial, it constituted an unsubstantiated allegation of misconduct that did not tend to negate the defendant's guilt, and the prosecutor therefore had no duty to inquire into or disclose the lawsuit as exculpatory evidence.  Accordingly, we affirm the motion judge's denial of the defendant's motion for a new trial.

So ordered.

LOWY, J. (concurring, with whom Cypher, J., joins).  I agree with the court that a prosecutor has no duty to inquire of prosecution team members whether they are facing any pending civil allegations.  I write separately to address how the ultimate admissibility of information, although certainly not dispositive of a prosecutor's obligation to inquire about that information, nonetheless helps inform the contours of a prosecutor's duty of inquiry.

"[T]he ultimate admissibility of the information is not determinative of the prosecutor's Brady obligation to disclose it," and neither is the ultimate admissibility of the information determinative of the prosecutor's Brady obligation to inquire of it.  Matter of a Grand Jury Investigation, 485 Mass. 641, 653 (2020) (Matter of Grand Jury).  See Brady v. Maryland, 373 U.S. 83, 87 (1963).  Certainly, a much broader array of evidence than just what is admissible is both discoverable and within the scope of a prosecutor's duty of inquiry.  See Commonwealth v. Beal, 429 Mass. 530, 531 (1999).

The ultimate admissibility of the information, however, is not wholly divorced from the prosecutor's Brady obligation to inquire of it.  Rather, the ultimate admissibility of the information provides valuable insight into the reasonableness of the prosecutor's duty of inquiry.  Indeed, in Matter of Grand Jury, 485 Mass. at 652, our analysis of what constituted

exculpatory evidence was inextricably intertwined with a discussion of the law of evidence as it related to the admissibility of certain impeachment evidence.  The court here also seems to recognize that admissibility informs, but is not dispositive of, questions of what constitutes exculpatory evidence and of the reach of the prosecutor's duty of inquiry.  See ante at    (implicitly looking to relevance and admissibility in holding that finding of civil liability against police officer must be related to officer's performance of his or her official duties, and not his or her personal life, to be discoverable); id. at    (concluding that "[b]ecause the finding of civil liability could have been used to impeach Moynahan . . . , it potentially would have been . . . subject to the duty of inquiry").

I embrace the point we made in Matter of Grand Jury, 485 Mass. at 650, that a determination whether to disclose exculpatory information, being forward-looking, is distinct from a determination whether a failure to disclose exculpatory information deprived a defendant of a fair trial, which is a backward-looking analysis.  That being said, courts look closely to admissibility in determining whether a failure to disclose exculpatory information deprived a defendant of a fair trial, indicating that questions of admissibility of evidence help inform questions of the scope of the duty of inquiry and the

3

duty of disclosure.  Cf. Commonwealth v. Jones, 432 Mass. 623, 633 (2000) ("To justify granting a new trial, the motion judge must find that there was a substantial risk that the jury would have reached a different conclusion had the 'newly discovered' evidence been admitted at trial" [citation omitted]); Commonwealth v. Tucceri, 412 Mass. 401, 413 (1992).

Where the analytical gap between what information is sought and what information might be admitted in evidence is so great, the improbability of the former leading to the latter provides some limitation on the scope of the duty of inquiry.  Although the duty of inquiry is significantly broader than simply whether a particular type of evidence would be admissible at trial, and although the admissibility of evidence is never determinative of the duty of inquiry, the ultimate admissibility of evidence can be a helpful tool when assessing the reasonableness of a prosecutor's duty of inquiry into the existence of that kind of evidence.  The more unrelated to the investigation, arrest, and prosecution of a defendant that an unproven contention of misconduct against a police officer on the prosecution team is, the greater the risk of obligating a prosecutor to search for evidence unlikely to have any effect on the underlying case. See Wood v. Bartholomew, 516 U.S. 1, 6 (1995) (per curiam) (holding State's failure to disclose witness's failed polygraph test did not violate Brady in light of fact that "polygraph

results were inadmissible under state law, even for impeachment purposes," and it was "mere speculation" as to how disclosure might have led to otherwise admissible evidence); <u>Hoke</u> v. <u>Netherland</u>, 92 F.3d 1350, 1356 & n.3 (4th Cir.), cert. denied, 519 U.S. 1048 (1996), citing <u>Wood</u>, <u>supra</u> (holding no violation of <u>Brady</u> where prosecution failed to disclose witness interviews that would likely have been inadmissible at trial and were, therefore, "as a matter of law, 'immaterial' for <u>Brady</u> purposes").

The ultimate admissibility of evidence is neither the touchstone nor even a requirement of what constitutes exculpatory evidence. Nonetheless, determining what constitutes exculpatory evidence must take place with at least some recognition of the law of evidence to be applied at trial. Otherwise, the principle of reasonableness as a limitation on the duty of inquiry would prove elusive. The more difficult the boundaries of the prosecutor's duty to inquire are to gauge, the more all those touched by investigation and prosecution of crime -- criminal defendants, victims, police witnesses, and prosecutors -- will be adversely affected.

CYPHER, J. (concurring).  I agree with the court that, in the limited context of this case, the prosecutor had no duty to inquire as to the unrelated, pending civil lawsuit because it was not exculpatory evidence.  I write separately, however, to propose an end to the Bohannon rule, as outlined in Commonwealth v. Bohannon, 376 Mass. 90 (1978) (Bohannon I), S.C., 385 Mass. 733 (1982) (Bohannon II) (collectively, Bohannon).[1]

Typically, "specific instances of misconduct showing the witness to be untruthful are not admissible for the purpose of attacking or supporting the witness's credibility."  Mass. G. Evid. § 608(b) (2023).  Despite this bar, Massachusetts has "chiseled a narrow exception" into the general rule, allowing evidence of prior false rape allegations to impeach a witness's credibility because, in special circumstances, "the interest of justice forbids strict application of the [general] rule." Commonwealth v. LaVelle, 414 Mass. 146, 151 (1993), citing

---

[1] The Commonwealth raised Commonwealth v. Bohannon, 376 Mass. 90 (1978) (Bohannon I), S.C., 385 Mass. 733 (1982) (Bohannon II) (collectively, Bohannon), both in its brief and during oral argument.

Bohannon I, 376 Mass. at 94.[2,3]  Rooted in the misogynist belief that women are prone to lying about sexual assault, admissibility of evidence of prior false allegations pursuant to Bohannon required a showing that "the witness was the victim in the case on trial, her consent was the central issue, she was the only Commonwealth witness on that issue, her testimony was inconsistent and confused, and there was a basis in independent third-party records for concluding that the prior accusations of the same type of crime had been made and were false." Commonwealth v. Sperrazza, 379 Mass. 166, 169 (1979), citing

---

[2] The second exception to the general bar proscribing admission of specific instances of misconduct is the allowance of specific instances of a police officer's false statements in prior, unrelated matters if the officer's credibility is a critical issue at trial.  See Matter of a Grand Jury Investigation, 485 Mass. 641, 651-652 (2020).

[3] Besides Massachusetts, only three other States have provisions that specifically allow evidence of prior false accusations to be admitted:  New Jersey, Virginia, and Rhode Island.  Altantulkhuur, A Second Rape:  Testing Victim Credibility Through Prior False Accusations, U. Ill. L. Rev. 1091, 1144-1146 (2018).  The remainder of the States generally prohibit both inquiry into prior specific instances of misconduct on cross-examination and extrinsic evidence, allow inquiry on cross-examination but not extrinsic evidence, or allow both inquiry on cross-examination and extrinsic evidence to attack or support the victim's character for truthfulness. Id. at 1116-1117.  Unlike Massachusetts's § 608(b), Rule 608(b) of the Federal Rules of Evidence permits a party on cross-examination of a witness to inquire into specific instances of prior conduct if probative of the witness's character for truthfulness, although except for criminal convictions under Fed. R. Evid. 609, extrinsic evidence is not admissible to prove specific instances of misconduct.  Compare Fed. R. Evid. 608 with Mass. G. Evid. § 608(b).

Bohannon I, supra at 95.  See Althouse, The Lying Woman, the Devious Prostitute, and Other Stories from the Evidence Casebook, 88 Nw. U. L. Rev. 914, 965 (1994) (explaining that in Bohannon, "[o]nce again, our attention is drawn to the victimized man and the untrustworthy woman").

In Bohannon I, the victim, who had an intelligence quotient of sixty-three, provided inconsistent testimony that the defendant and codefendant may or may not have raped her on the night in question.  Bohannon I, 376 Mass. at 91.  To impeach her credibility, defense counsel sought to cross-examine the victim about whether she made prior accusations that other men had raped her, and, as an offer of proof, referenced hospital records that suggested that the complainant had made "a number of unsubstantiated, and apparently false, accusations of rape." Id. at 92-93.  Concluding that the proffered evidence, if believed, would have had a significant impact on the sole issue of consent, the court reversed the convictions to allow the proposed questions to be asked at a new trial.  Id. at 95.  The court further explicated that the decision did not implicate the rape shield statute, G. L. c. 233, § 21B, because the proposed questions dealt with prior allegations of rape and were "in no way sought to elicit a response concerning the complainant's prior sexual activity or reputation for chastity."  Bohannon I, supra.  Notably, on appeal after remand, the court discerned no

abuse of discretion in the trial judge's exclusion of the hospital records because, although Bohannon I allowed extrinsic evidence to prove prior false allegations of rape, the hospital records at issue were inadmissible unreliable hearsay given that they were "extremely sketchy, vague, inaccurate as to where the information came from, contained hearsay piled upon hearsay," and were not related to the victim's diagnosis or treatment. Bohannon II, 385 Mass. at 750.

While the Bohannon rule has only appeared in a limited number of published rape and sexual assault cases, see Bohannon and Commonwealth v. Nichols, 37 Mass. App. Ct. 332 (1994), the problematic origin of the rule requires that the court reexamine whether to continue its use. Although the Bohannon court indicated that the decision should not "be viewed as indicating any adherence to that 'part of a legal tradition, established by men, that the complaining woman in a rape case is fair game for character assassination in open court,'" it is difficult to distinguish the holding from the continuing belief that women lie about rape and sexual assault so thus have a character for untruthfulness. Bohannon I, 376 Mass. at 95, quoting Commonwealth v. Manning, 367 Mass. 605, 613-614 (1975) (Braucher, J., dissenting). The foundation of the rule was premised on the belief that a rape allegation had been

concocted; however, in <u>Bohannon</u>, the alleged falsity of the victim's prior allegation was never established.

According to the rule, there must be "a factual basis from independent third party records for concluding that the prior accusations of rape had, in fact, been made and were, in fact, untrue," <u>Bohannon I</u>, 376 Mass. at 95; however, "falsity" is a complicated aspect to prove. It is especially complicated when the allegation alleged to be false is a past allegation. See <u>id</u>. In order to demonstrate falsity, courts have relied on a victim's recantation of the alleged accusation made against an alleged perpetrator. See <u>Commonwealth</u> v. <u>Martin</u>, 467 Mass. 291, 310 & n.27 (2014); <u>Nichols</u>, 37 Mass. App. Ct. at 335. However, a rape or sexual assault victim may recant for a myriad of reasons other than untruthfulness, including "threats made by the perpetrator, denial, shame, embarrassment, self-blame, not wanting to relive the trauma, and avoiding a lengthy trial or public exposure." Altantulkhuur, A Second Rape: Testing Victim Credibility Through Prior False Accusations, U. Ill. L. Rev. 1091, 1094 (2018). That the rule allows a recantation to be admitted in a subsequent trial to discredit and undermine the victim's credibility risks further traumatizing the victim. <u>Id</u>.

Further, where a victim does not recant, falsity can likely only be proved by delving into the victim's past sexual encounters. Courts must reconcile a defendant's right to

confront his accuser and present a full defense with the important principle that irrelevant or misleading evidence should not be admitted.  The rules of evidence should not be used, in effect, as a second assault, subjecting the witness to rehash sexual experiences on the witness stand.  Exposure in court of prior sexual experiences is protected by the rape shield law.  See G. L. c. 233, § 21B; Mass. G. Evid. § 412.  Given the wealth of knowledge we have about trauma responses and the many reasons victims recant or may provide inconsistent testimony, there is no reason that this should not also fall within the rape shield law.[4]

---

[4] It is often the case that rape and sexual assault victims who have "credibility" issues have been victimized throughout their lives, which makes them appear unstable or present themselves in a manner contrary to what the jury may believe as typical of an assault survivor.  See Cole, She's Crazy (to Think We'll Believe Her):  Credibility Discounting of Women with Mental Illness in the Era of #MeToo, 22 Geo. J. Gender & L. 173, 174-175 (2020); Lave, The Prosecutor's Duty to "Imperfect" Rape Victims, 49 Tex. Tech L. Rev, 219, 230-231 (2016); Schafran, Maiming the Soul:  Judges, Sentencing and the Myth of the Nonviolent Rapist, 20 Fordham Urb. L.J. 439, 448 (1993).

WENDLANDT, J. (concurring, with whom Kafker, J., joins).  I agree that a bright line rule is helpful to guide prosecutors as to their duty to disclose civil lawsuits.  I write separately because I do not share the Commonwealth's view (which the court apparently endorses) that civil lawsuits necessarily are unsubstantiated until a finding of liability.  When a civil action is commenced, counsel must certify that the allegations therein have a basis in fact after reasonable investigation.  See Mass. R. Civ. P. 11 (a), as amended, 456 Mass. 1401 (2010) (attorney signature certifies "that to the best of the attorney's knowledge, information, and belief there is good ground to support [the pleading]"); Fed. R. Civ. P. 11(b)(3) (in presented pleading, attorney certifies that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation").  The allegations in the complaint must plausibly suggest a right to relief, and in the case of a claim of fraud, the particularity requirement must be met.[1]  See Ashcroft v. Iqbal, 556 U.S. 662,

_____

[1] To the extent the claim is frivolous, a cross claim for, inter alia, abuse of process could be brought; such a cross claim should survive a special motion to dismiss.  See G. L. c. 231, § 59H (motion to dismiss claim based on petitioning activity should be denied where petitioning activity "was devoid of any reasonable factual support or any arguable basis in law" and "moving party's acts caused actual injury to the responding party").

678 (2009) ("a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" [quotation and citation omitted]); Mass. R. Civ. P. 9 (b), 365 Mass. 751 (1974) ("all averments of fraud . . . shall be stated with particularity"); Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud . . ."). See also DeWolfe v. Hingham Centre, Ltd., 464 Mass. 795, 798 n.8 (2013) (fraud claim not pleaded with sufficient particularity where no facts alleged that defendant knew that representations were false).

Significantly, a claim against a police officer in the scope of her official capacity often must overcome a motion, usually filed early in the litigation, on the basis that the officer's actions were protected by the doctrine of qualified immunity. See Lynch v. Crawford, 483 Mass. 631, 635 (2019) ("we have noted the importance of determining immunity issues early if immunity is to serve one of its primary purposes:  to protect public officials from harassing litigation" [quotations and citation omitted]).  And where the claim nonetheless survives a defense of qualified immunity, it often must overcome a motion for summary judgment.  Mass. R. Civ. P. 56, 365 Mass. 826 (1974).  Fed. R. Civ. P. 56.  At that stage of the civil litigation, the plaintiffs cannot rest on mere allegations; they must come forward with specific admissible evidence that, if

believed, would permit a verdict in their favor on the claim. Mass. R. Civ. P. 56 (e) (in response to motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial").  Fed. R. Civ. P. 56(c) (parties must "cit[e] to particular parts of materials in the record" to show genuine dispute of material fact).

Nonetheless, I join the court because a line is helpful and because the defendant readily could access publicly available information regarding a pending civil action against the officers that are part of the prosecution team.